**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| GLORIA TOVAR, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2975 (RC) |
| | : | | |
| v. | : | Re Document No.: | 77 |
| | : | | |
| CALLISONRTKL INC., | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Gloria Tovar ("Plaintiff") sued her former employer, CallisonRTKL Inc. ("Callison"), alleging that the company engaged in illegal discrimination.  Her remaining claims allege that Callison violated the D.C. Human Rights Act ("DCHRA") by failing to accommodate her disabilities and firing her for seeking those accommodations.  Callison now moves for summary judgment on those two claims.  Because Tovar cannot demonstrate a genuine dispute of material fact regarding these remaining issues, the Court grants Callison's motion for summary judgment.

## II.  BACKGROUND

### A.  Factual Background

Tovar began a full-time position as a marketing coordinator at Callison in 2015.  Pl.'s Ex. 7 at 58, ECF No. 79-5.[1]  She suffers from attention deficit hyperactivity disorder ("ADHD") and

---

[1] For clarity and brevity, Tovar's exhibits in opposition to Callison's Motion for Summary Judgement, found at ECF No. 79-5, are labeled "Pl.'s Ex. [exhibit number]" and all page numbers citing to Tovar's exhibits refer to the ECF-generated page numbers in ECF No. 79-5.  Similarly, Callison's exhibits in support of its Motion for Summary Judgement, found at

a hearing impairment.  Pl.'s Ex. 35 at 175.  Tovar's supervisors, as well as human resources

staff, were aware that she suffers from ADHD.  Def.'s Resp. to Pl.'s Statements of Fact ("Def.'s

Resp.") at 4–5, ECF No. 80-1.  While Tovar also experiences post-traumatic stress disorder, Pl.'s

Ex. 35 at 175, she did not disclose that diagnosis to her employer.  Pl.'s Opp'n to Summ. J.

("Pl.'s Opp'n") at 11, ECF No. 79.  Tovar's 2015, 2016, and 2017 employment evaluations

generally reflected satisfactory performance.  Pl.'s Exs. 2–4.  Her 2018 evaluation contained

similar performance ratings but included points for improvement, such as "[p]resence in the

office" and to "[b]e more proactive in her professional growth and development."  Pl.'s Ex. 5 at

46.

In September 2019, Callison issued a revised seating plan for its D.C. office, Def.'s Resp.

at 8, and Tovar requested an accommodation to sit in a quieter location, Def.'s Reply Ex. 45 at

10–11, ECF No. 80-2.  Supervisor Marissa Tasho told Tovar—in front of other staff members—

that she was required to sit where she was assigned.  Def.'s Resp. at 12; Def.'s Reply Ex. 45 at

10–11.  Tovar objected, and she was ultimately provided the seating assignment she requested.

Def.'s Resp. at 16; Def.'s Ex. 2 at 17–19, ECF No. 77-4.

In February 2020, supervisor Erin Ongena had an in-person conversation with Tovar to

discuss performance issues that had been reported to her.  Def.'s Resp. at 18.  She cited "time

management," "missed deadlines[,]" and "presence in the office" as areas requiring attention.

Def.'s Ex. 4 at 15, ECF No. 77-6; *see also* Pl.'s Ex. 35 at 176.  Ongena also expressed concerns

over "friction and some disconnect" affecting Tovar's collaboration with her team.  Def.'s Ex. 4

---

ECF Nos. 77-3 through 77-46, are labeled "Def.'s Ex. [exhibit number]."  Exhibits included with
Callison's Reply, found at ECF No. 80-2, are labeled "Def.'s Reply Ex. [exhibit number]" and
all page numbers citing to these exhibits refer to the ECF-generated page numbers in ECF No.
80-2.

at 19.  Tovar took responsibility for several of these issues in an email later that month.  *See* Def.'s Ex. 12, ECF No. 77-14.

Around the same time, Ongena began collecting input from company leadership for Tovar's 2019 evaluation.  Def.'s Resp. at 21.  That feedback was mixed, noting that Tovar was not "overly passionate or schedule-focused," Def.'s Ex. 13, ECF No. 77-15; that experiences "ha[d] been hit or miss" and she "complete[ly] missed a deadline," Def.'s Ex. 14, ECF No. 77-16, and that "[i]t's been a struggle working with" her, but that "improvements ha[d] been made," Def.'s Ex. 15, ECF No. 77-17.  Tovar's 2019 review, provided in April 2020, reflected these opinions, noting "lack of consistent communication, lack of pro activeness around non-deadline tasks, and lack of engagement with her counterparts."  Pl.'s Ex. 6 at 52; Def.'s Resp. at 36–37.

On March 6, 2020, Tovar contacted human resources specialist Courtney Gsell to request accommodations to minimize distractions in her work area.  Def.'s Resp. at 26–27; Def.'s Ex. 2 at 38.  Tovar did not tell her supervisors about the request and asked Gsell not to discuss the issue with them.  Def.'s Resp. at 28, 32–33; Def.'s Ex. 2 at 39.  Gsell worked on the accommodations request—which involved seeking input from a third-party contractor that managed the company's formal accommodations process—over the following days.  *See* Def.'s Resp. at 29–32; Def.'s Ex. 19, ECF No. 77-21.

On March 13, 2020, Callison began allowing employees to work from home in response to the COVID-19 pandemic, and starting March 27 the company required all staff to work from home.  Def.'s Resp. at 33–34.  On April 13, 2020, Callison management announced to staff that it planned to conduct layoffs due to the pandemic and declining financial health.  *Id.* at 34.  The company soon conducted a first round of layoffs.  Def.'s Ex. 9 at 21–22, ECF No. 77-11.

On June 4, 2020, Tovar contacted Gsell again regarding the accommodations process. Def.'s Resp. at 42–43.  Tovar once more asked that the request be kept from her supervisors, and she did not discuss the matter with them.  *Id.* at 46; Def.'s Ex. 28, ECF No. 77-30.  Human resources staff followed up on July 2, 2020, Def.'s Resp. at 46–47, and Tovar provided a list of requested accommodations on July 16, *id.* at 47.

While the accommodation process proceeded, Callison commenced a second round of staff reductions beginning July 10, 2020.  *Id.* at 48.  Company leadership instructed each department to downsize by dismissing a certain number of individuals.  *Id.* at 51.  Tovar's supervisors, Tasho and Ongena, decided to terminate Tovar's employment as part of these staff reductions, citing performance issues.  *Id.* at 49–50.  Neither Tasho nor Ongena was aware, at the time they decided to fire Tovar, of any open accommodation request.  *Id.* at 52.  On July 27, 2020, Ongena and Gsell called Tovar, during which they explained that Callison was dismissing her as a result of performance issues and restructuring due to economic pressures related to COVID-19.  *Id.* at 56-57.

## B.  Procedural Background

On October 22, 2021, Tovar filed a five-count employment discrimination complaint against Callison in the Superior Court of the District of Columbia, ECF No. 1-1, and Callison removed the action to this Court on November 10, 2021, ECF No. 1.  Callison moved for judgment on the pleadings on three counts: hostile work environment under the DCHRA, unlawful subterfuge under the DCHRA, and negligent infliction of emotional distress.  ECF No. 20.  The parties then stipulated to dismiss the hostile work environment and unlawful subterfuge claims, which the Court treated as a motion to amend the complaint.  ECF No. 23; ECF No. 35. The Court granted Callison's motion as to the claim for negligent infliction of emotional distress

and granted the parties' request to dismiss the other two claims.  ECF No. 35.  Callison now

moves for summary judgment on the final two claims: failure to accommodate and unlawful

retaliation under the DCHRA.  ECF No. 77.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A dispute is genuine if "the evidence presents a sufficient disagreement to

require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

And a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at

248.  On summary judgment, the Court views all evidence "in the light most favorable to the

nonmoving party and the [C]ourt [ ] draw[s] all reasonable inferences in favor of the nonmoving

party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of

factually unsupported claims or defenses and determining whether there is a genuine need for

trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  The movant bears the initial

burden of identifying portions of the record that demonstrate the absence of any genuine issue of

material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-

movant must point to specific facts in the record that reveal a genuine issue that is suitable for

trial.  *See Celotex*, 477 U.S. at 324.  In considering a motion for summary judgment, a court must

"eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475

F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the

light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.  Nevertheless,

conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

The Court's analysis proceeds in three parts.  After a brief comment on the parties' statements of material facts, the Court evaluates Tovar's failure-to-accommodate claim.  The Court then considers the claim that Callison retaliated against Tovar for engaging in activity protected under the DCHRA.

### A.  Genuine Disputes of Material Fact

Before delving into legal analysis, the Court addresses the content of the parties' statements of material facts.  Under Rule 56, a motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact," as demonstrated by "materials in the record."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited" do not bear on the dispute or do not constitute admissible evidence.  Fed. R. Civ. P. 56(c)(1).  This Court supplements Rule 56 with Local Rule 7(h), which requires a moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record."  The nonmoving party must then file "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  *Id.*  That separate statement "shall include references to the parts of the record relied on to support the statement."  *Id.*  "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are

admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.*

Plaintiff has not adhered to Rule 7(h), failing to rebut most of Callison's specific factual assertions with evidence and citations to the record. As Callison notes, *see* Def.'s Resp. at 26, many of the factual assertions Plaintiff advances in opposition to summary judgment contain no citations to exhibits in the record. *See, e.g.*, Pl.'s Statement of Genuine Material Facts in Dispute ("Pl.'s Statement") at ¶¶ 6, 10, 16, 22, 24, 39, 42, 47–49, 51, 54–55, 57, ECF No. 79-2. Other assertions of fact discuss material that is not included in the record. *See, e.g.*, *id.* ¶¶ 11, 13, 23, 25. In addition, Plaintiff's responses to Callison's statements of fact largely fail to dispute the precise factual assertions made and instead address other issues. *See generally* Def.'s Resp.

The Court has discretion to invoke the strictures of Rule 7(h). *See Burke v. Gould*, 286 F.3d 513, 518 (D.C. Cir. 2002). At the same time, Rule 56's burden "does not shift simply because the non-moving party fails to oppose the motion." *Cohen v. Bd. of Trustees of the Univ. of D.C.*, 819 F.3d 476, 482 (D.C. Cir. 2016). As such, "[summary] judgment is granted only after the District Court satisfies itself that the record and any undisputed material facts justify granting summary judgment." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016). The Court has therefore reviewed the record as a whole to determine whether it contains any evidence—properly cited or not—to support Plaintiff's remaining claims. Where the Court cannot find support for Plaintiff's assertions, it "take[s] Defendants' statement[s] as undisputed." *Anand v. U.S. Dep't of Health & Hum. Servs.*, No. 21-cv-1635, 2023 WL 2646815, at *8 (D.D.C. Mar. 27, 2023); *see also* Fed. R. Civ. P. 56(e)(3) (permitting the Court to "grant summary judgment if the motion and supporting materials--including the facts considered undisputed-- show that the movant is entitled to it").

### B.  Failure to Accommodate

DCHRA disability discrimination claims are analyzed under the same framework as those under the Americans with Disabilities Act ("ADA").  *Dougherty v. Cable News Network*, 396 F. Supp. 3d 84, 101 (D.D.C. 2019).  Under the ADA, a covered employer is required to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (citation omitted).  To state a claim for failure to accommodate, the plaintiff must demonstrate that "(1) he was a qualified individual with a disability; (2) his employer had notice of his disability; and (3) his employer denied his request for a reasonable accommodation."  *Badwal v. Bd. of Trs. of the Univ. of D.C.*, 139 F. Supp. 3d 295, 312 (D.D.C. 2015) (citing *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014)).  "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."  *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

In determining an appropriate reasonable accommodation, there should be "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'"  *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).  When a breakdown occurs, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary."  *Id.*  "[C]ourts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Id.*  "In sum, to establish that her request was

'denied,' [a plaintiff] must show either that the [employer] in fact ended the interactive process or that it participated in the process in bad faith." *Id.*

Callison does not dispute *Ward*'s first two requirements: (1) that Tovar "was a qualified individual with a disability" or that Callison "had notice of her disability." 762 F.3d at 31. Callison instead argues that Tovar cannot meet *Ward*'s third requirement: that Callison "denied her request for a reasonable accommodation." *Id.*; *see also* Def.'s Mot. Summ. J. ("Def.'s Mot.") at 5, ECF No. 77-1. Callison adds that Tovar cannot succeed on her failure-to-accommodate claim because she did not provide human resources staff with "any specifics" regarding her accommodation request until July 16, 2020. Def.'s Mot. at 7–10. As a result, Callison could not have denied the request because it did not know what accommodations Tovar sought. *Id.* at 9. Tovar responds that her request was not an undue hardship, and that Callison failed to engage in the interactive process with Tovar by delaying and providing incorrect instructions. Pl.'s Opp'n at 16–26. Callison replies that the delay was reasonable and that its staff participated in good faith. Def.'s Reply at 6–12, ECF No. 80. Under the undisputed facts, the Court concludes that Tovar has not proffered evidence from which a reasonable jury could find that Callison was responsible for any breakdown in the interactive process.[2]

As Callison argues, the undisputed facts demonstrate that within days of Tovar's request for accommodations, human resources staff began the company's process to involve a third-party contractor and determine what changes might be appropriate. Def.'s Mot. at 7. The parties exchanged communication over the ensuing days to collect details on the accommodation request

---

[2] Callison argues that Tovar received any accommodations requested in September 2019, such that the request cannot support a failure-to-accommodate claim. Def.'s Mot. at 7. Tovar does not contest this assertion. *See generally* Pl.'s Opp'n. Because the September 2019 accommodation request is not in dispute, the Court considers only the March–July 2020 interactive process as a basis for Tovar's failure-to-accommodate claim.

and initiate that process with the third-party contractor.  Def.'s Resp. at 29–32.  On March 13,

2020—one week after Tovar requested accommodations to address workplace distractions—the

COVID-19 pandemic prompted Callison to adopt remote work policies.  *Id.* at 33–34.

The parties spar over who sent the last email on March 12, the day before remote work

policies went into effect.  *See* Def.'s Resp. at 29–32.  Callison presents a March 12 email from

Gsell to Tovar asking for a call to gather more information on the request, to which Tovar did

not respond.  Def.'s Resp. at 30–31; Def.'s Ex. 18, ECF No. 77-20.  Tovar contends that she

never received the email.  Def.'s Resp. at 30–31.  The issue is immaterial, however, as sending

or failing to send a single follow-up email as part of the interactive process does not demonstrate

an employer's failure to engage in "a flexible give-and-take" with an employee, nor does it show

that Callison "ended the interactive process."  *Ward*, 762 F.3d at 32.  Tovar herself did not

reengage with human resources staff until June 4, 2020.  Def.'s Resp. at 41–42; Pl.'s Statement

¶ 31.  When she did, Gsell responded and continued the process the same day.  *See* Def.'s Resp.

at 44; Pl.'s Statement ¶ 32.  Gsell's actions "bore all the hallmarks of good faith," including

communicating with Tovar and seeking "more information . . . to help . . . determine an

appropriate accommodation."  *Ward*, 762 F.3d at 34.

In addition, it was reasonable for Callison human resources staff, who were themselves

experiencing the pandemic, to believe that a shift to work-from-home status would moot Tovar's

request addressing the office environment.  *See* Def.'s Reply at 9.  Tovar did not follow up with

human resources staff during the ensuing months, nor did she mention the issue to her

supervisors.  Def.'s Resp. at 39.  Indeed, the list of specific accommodations Tovar eventually

submitted on July 16, 2020, included several items that work-from-home status already

addressed.  *See id.* at 47 (including "[a]llow some work from home," "[p]rovide workspace that minimizes distractions," and "[a]llow use of noise cancellation headphones or white noise").

Tovar argues that the three-month delay in the interactive process creates a dispute of fact as to whether Callison acted in bad faith.  *See* Pl.'s Opp'n at 25.  "A party that obstructs or delays the interactive process is not acting in good faith."  *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805).  "In determining whether a particular delay is unreasonable, courts look to factors such as 'the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith.'"  *Matos v. DeVos*, 317 F. Supp. 3d 489, 499 (D.D.C. 2018) (quoting *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262–63 (10th Cir. 2001)).

First, the length of the delay—three months—does not alone support a finding that Callison acted unreasonably.  "A four- or six-month wait is not inordinate time" for an employer to make accommodations.  *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 72 (D.D.C. 2019); *see also Marks v. Washington Wholesale Liquor Co.*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017) ("A relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim."); *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 224 (D.D.C. 2022) (finding delay of eighty days insufficient to find unreasonableness).  The three-month delay here similarly does not support an inference of unreasonableness.  Second, the reasons for the delay weigh strongly toward a finding that Callison acted reasonably.  The parties ultimately lost track of who was supposed to reply next in an email chain during the pandemic's onset.  In addition, Callison human resources staff believed the switch to work-from-home status made any workplace accommodations unneeded, meaning there was no need to follow up with Tovar to advance the process.  *See* Def.'s Reply at 9.  Third, Tovar in fact received many alternative

accommodations during work-from-home status.  *See* Def.'s Resp. at 47.  Callison did not learn

of additional specific requests until July 16, 2020.  *Id.*  To the final factor—good faith—Tovar

proffers no evidence that Callison sought to use the delay as a means to deny her request.  As

such, the three-month delay does not create a factual dispute here.

Tovar additionally takes aim at Gsell's initial lack of familiarity with Callison's human

resources systems.  *See* Pl.'s Opp'n at 21–26.  On March 6, Gsell instructed Tovar to contact the

third-party contractor directly.  Def.'s Resp. at 74.  This instruction turned out to be incorrect, as

the process required the company's benefits department to initiate the request.  *Id.*  Gsell

clarified this process and responded to Tovar on March 12 with the correct information.  *Id.*  This

minor misunderstanding, however, does not represent a breakdown of the interactive process

supporting a failure-to-accommodate claim.  It demonstrates just the opposite—that Callison

human resources worked to address Tovar's request rather than ignoring it.

Finally, Tovar's argument that her accommodations did not impose an undue hardship on

Callison are inapposite.  *See* Pl.'s Opp'n at 16–18.  "Under the ADA's scheme . . . it is

discriminatory for a covered employer to decline to take reasonable steps to accommodate an

employee's disability, unless the steps in question 'would impose an undue hardship on the

operation of the business' of the employer."  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1300

(D.C. Cir. 1998) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Yet Callison nowhere argues that

granting Tovar's requests would have resulted in an undue hardship.  *See* Def.'s Reply at 7 n.6

("'[U]ndue hardship' has never been an issue in this case.").  Callison instead contends that it

never "decline[d] to take reasonable steps to accommodate [Tovar]'s disability" in the first place. *Aka*, 156 F.3d at 1300.[3]

For these reasons, Tovar cannot demonstrate that Callison "denied" her request for accommodations, that it "in fact ended the interactive process," or that "it participated in the process in bad faith." *Ward*, 762 F.3d at 32. As a result, Tovar does not demonstrate a genuine dispute of material fact for trial on the failure-to-accommodate claim.

### C. Unlawful Retaliation

To succeed on a retaliation claim, a plaintiff needs to show "that she engaged in protected activity, that she suffered an adverse employment action, and that there was a causal link between the former and the latter." *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Once a plaintiff establishes a prima facie case, the employer must provide a legitimate non-discriminatory or non-retaliatory reason for its adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Allen*, 795 F.3d at 39. If the employer cannot provide an actual, legitimate reason for the action, then the plaintiff is entitled to judgment. *Allen*, 795 F.3d at 39. If "the employer proffers a non-retaliatory reason for the challenged employment action, the burden-shifting framework falls away." *Id.* "[T]he central question" then "becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's

---

[3] Tovar also argues that Gsell is not credible, contending that this undermines the reason for her dismissal. Pl.'s Opp'n at 21. This argument would be more suited to address Tovar's claim for retaliation, not failure to accommodate. Nonetheless, this Court does not make credibility determinations at the summary judgment stage. *DeJesus v. WP Co.*, 841 F.3d 527, 531 (D.C. Cir. 2016). The only factual dispute the Court can discern from this part of the briefing reiterates Tovar's claim that the July 16 job vacancy indicates pretext. As discussed below, Tovar fails to show a genuine dispute of material fact regarding that issue.

asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Id.* (cleaned up).

Summary judgment must be granted for the defendant if the plaintiff fails to "produce sufficient evidence that would discredit [the employer's proffered explanation] and show that the actions were retaliatory" or discriminatory. *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008). The Court should consider "all of the evidence," including "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

Callison asserts that Tovar's unlawful retaliation claim fails because she presents no evidence demonstrating that her pursuit of accommodations led to her termination. Def.'s Mot. at 14. Callison contends that Tovar's September 2019 accommodations request was too far removed from her July 2020 dismissal to show causation, and that Tovar's supervisors were unaware of her accommodation requests in 2020. *Id.* at 14–15. Tovar responds that she was targeted after seeking accommodations in September 2019, that Callison's motives were pretextual, and that the company's explanations for Tovar's dismissal shifted over time. Pl.'s Opp'n at 2–3, 26–33. Callison replies that Tovar's arguments rely on her own view of events without support from admissible evidence. Def.'s Reply at 16–19. The Court finds that Tovar has failed to offer evidence demonstrating a genuine factual dispute for trial.

### 1. Callison's Nondiscriminatory Reasons

Callison maintains that it terminated Tovar because it engaged in "a company-wide multi-phase reorganization brought about because of the COVID-19 pandemic" during which it "used performance as the determinative factor in selecting who would be laid off."  Def.'s Mot. at 1.  "[A] reduction in force is a legitimate, nondiscriminatory reason for termination."  *Bennett v. District of Columbia.*, 6 F. Supp. 3d 67, 75 (D.D.C. 2013) (citing *Goss v. George Washington Univ.*, 942 F. Supp. 659, 664 (D.D.C. 1996)); *see also Bhatia v. AT & T, Inc.*, 310 F. Supp. 2d 29, 32 (D.D.C. 2004).  So too may an employer lawfully fire a staff member for poor performance.  *See Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 27 (D.C. Cir. 1997) (concluding that "substandard performance" represents "a legitimate non-discriminatory reason for . . . termination"); *Chowdhury v. Schafer*, 587 F. Supp. 2d 257, 264 (D.D.C. 2008); *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010).

### 2. Whether a Reasonable Jury Could Find a Pretext for Unlawful Discrimination

Because Callison has stated legitimate, nondiscriminatory reasons for discharging Tovar, the next question is whether Tovar "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against" her.  *Brady*, 520 F.3d at 494.  The Court addresses each instance of protected activity in turn.

#### a. The 2020 Accommodation Request

To start, Tovar cannot show that Callison dismissed her because of her March 2020 request for accommodations.  As Callison points out, the managers who decided to terminate Tovar were not made aware of her 2020 accommodation request until well after the decision had been made.  *See* Def.'s Reply at 17.  Callison puts forward evidence, in the form of deposition

transcripts and emails, demonstrating that neither Ongena nor Tasho knew of the request at the time they decided to terminate Tovar in mid-July.  *See* Def.'s Resp. at 48–49.  Tovar advances no evidence to rebut Callison's assertion of this fact, and the Court finds none in the record.  *See* Def.'s Resp. at 52.  Tovar similarly does not contest that her managers learned of the 2020 accommodation request on July 23, 2020, only after informing Gsell of their intention to dismiss Tovar.[4]  Def.'s Resp. at 54.

In the absence of other evidence demonstrating her managers' knowledge, the temporal proximity between the 2020 request and subsequent dismissal represents the only evidence of retaliation.  While temporal proximity may suffice to establish a prima facie case of discrimination within the *McDonnell Douglas* burden-shifting framework, *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), once an employer provides legitimate reasons, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).  Because Tovar cannot show that her managers were aware that she was engaging in protected activity—and temporal proximity in not enough—she cannot show "a causal link between" the 2020 accommodation request and her termination.  *Allen*, 795 F.3d at 39.

---

[4] Callison cannot be faulted for declining to reevaluate its decision to discharge Tovar after learning about the accommodation request.  "It is well-established that '[e]mployers need not suspend previously planned [actions] upon discovering that a [protected activity was engaged in], and their proceeding along lines previously contemplated . . . is no evidence whatever of causality.'" *Gruenberg*, 643 F. Supp. 3d at 236–37 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)) (alterations in original).

### b.  The 2019 Accommodation Request

Tovar similarly produces insufficient evidence to show that Callison discharged her in July 2020 because of the September 2019 accommodation request.  Tovar contends that her September 2019 interaction with Tasho regarding office seating prompted a concerted effort to paint her as a poor performer as a pretext for termination based on her pursuit of accommodations.  *See* Pl.'s Opp'n at 10–16, 26–33.  According to Tovar, this included Tasho "poison[ing] the well" by turning Ongena against her and causing her to write a negative 2019 performance review.  *Id.* at 16.  Tovar additionally cites managers' questions and comments she contends show animus towards her.  *Id.* at 3, 10.

Callison provides significant evidence showing that it dismissed Tovar based on managers' perceptions of her performance, and she provides little evidence to the contrary.  The company cites leaders' contemporaneous opinions on their experiences working with her, collected in February and March 2020.[5]  *See* Def.'s Exs. 13–15.  One executive stated that "she was competent in her work" but that she was not "overly passionate or schedule-focused" in comparison to other staff members.  Def.'s Ex. 13.  Another stated that his experiences had been "hit or miss," that it was "challenging getting her to respond," and that she "complete[ly] missed a deadline."[6]  Def.'s Ex. 14.  The third reviewer asserted that "it's been a struggle working with" Tovar, and that she had a "hard time with time management," although there was recent "progress which [he was] happy with."  Def.'s Ex. 15.  The parties also do not dispute that

---

[5] Although Tovar does not object to the admissibility of these statements, the Court determines that the statements do not represent hearsay because they are relevant to show company leadership's impressions of Tovar and the statements' effects on her managers rather than "the truth of the matter[s] asserted in the statement[s]."  Fed. R. Evid. 801(c)(2).

[6] Around the time of her dismissal, one human resources manager additionally contacted Tovar's managers to complain that they "struggle[d] with" the timeliness of her time sheet submissions.  Def.'s Ex. 38, ECF No. 77-40.

Ongena discussed various performance issues with Tovar in February 2020.  Def.'s Resp. at 18–
19.  Several of the problems raised, including presence in the office, mirrored critiques in
Tovar's 2018 review, which she received in April 2019 before making any accommodation
request.  *See* Def.'s Ex. 4 at 15; Pl.'s Ex. 5 at 46.  In addition, Tovar includes as an exhibit a
January 2020 email to Tasho from another staff member expressing displeasure with Tovar's
productivity.  Pl.'s Ex. 24 at 147–48.

 Tovar herself recognized areas for improvement.  Following the February 2020
discussion with Ongena, Tovar sent an email taking responsibility for recent performance issues
and describing a plan to remedy them.  Def.'s Ex. 12.  These issues included "a problem
managing long-term projects that don't have specific deadlines," "[p]rioritizing," "proactiv[ity],"
and that she would "frequently" arrive "late and leave early."  *Id.*  The company also offers a text
message in which Tovar expressed to another coworker, on the day Callison discharged Tovar,
that she "messed up big time again" and believed she was "getting fired" because of it.  Def.'s
Ex. 42.  The evidence indicates that even Tovar perceived her work as failing to meet
expectations.  Tovar points to no evidence tending to show that managers and company
leadership did not perceive her as a poor performer in comparison to other staff members.  She
instead speculates that Ongena sought negative feedback as a ploy "to aid Tasho in justifying
terminating" her, Def.'s Resp. at 23, and denies Callison's assertions of fact without citation to
evidence, *see, e.g.*, *id.* at 51–52.

 The company presents evidence, too, of the process by which it conducted its reductions
in force.  It is undisputed that Callison engaged in company-wide layoffs throughout 2020, and
that Tovar was aware of these staff reductions.  *See id.* at 34; Def.'s Ex. 2 at 77.  One manager's
deposition testimony indicates that the firm "went from 1200 to 950 employees" during 2020 and

2021.  Def.'s Ex. 3 at 9, ECF No. 77-5.  Notably, Tovar was not dismissed in the first wave of layoffs, greatly undermining the notion that her managers used the reduction in force as a pretext to dismiss her for seeking accommodations in 2019.  *See* Def.'s Ex. 9 at 21.  Callison also includes a July 10 email in which a manager noted that "marketing staff reductions need to be made."  Def.'s Ex. 36.  Callison cites Tasho and Ongena's deposition testimony, in which the managers explained that marketing coordinators were selected for termination based on "performance issues first."  Def.'s Mot. at 12; Def.'s Ex. 9 at 21.  Tovar's managers additionally explain, in their deposition testimony, that other staff members were similarly discharged for falling below performance standards.  *See* Def.'s Resp. at 50–51.  This evidence tends to show that company leadership instructed Tovar's managers to downsize the department, and that she was selected during that process.

Tovar contends, however, that the 2019 incident with her manager related to office seating sparked an ongoing campaign of retaliation arising from the request, such that one could infer that Callison's decision to fire her arose from the same incident.  *See id.* at 12–13 (asserting that Tasho "ultimately started a campaign to get Ongena to fire" Tovar).  The problem is that Tovar's theories rely primarily on her own speculation about these events, and her managers' motivations, rather than any form of admissible evidence.  She cites, for instance, her declining performance reviews and asserts that she was instead a high-performing employee.  *See* Pl.'s Opp'n at 11–16.  This argument misses the mark, as the question is not whether Tovar actually failed to meet her employer's standards, but whether her supervisors *perceived* her as a poor performer.  *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly

believes in the reasons it offers.'"); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n

employer's action may be justified by a reasonable belief in the validity of the reason given even

though that reason may turn out to be false."); *see also Williams v. Spencer*, 883 F. Supp. 2d 165,

179 (D.D.C. 2012) (holding that evidence plaintiff was in fact performing well "does not

necessarily prove that an employer's statement about plaintiff's poor performance is pretext").

Tovar additionally points to comments she alleges demonstrate a discriminatory animus

towards her.  She states that Tasho once "made a joke about how she's going to put bells and

mirrors around my desk so that [she doesn't] get startled."  Pl.'s Ex. 35 at 175; *see also* Pl.'s

Opp'n at 10.  Tovar also cites an instance where Tasho "felt the need to strike up a conversation

with Ms. Tovar about her wearing a hearing aid while they were out at a work related function."

Pl.'s Opp'n at 10–11; *see also* Pl.'s Ex. 35 at 175.  Although this evidence perhaps indicates that

Tasho was aware of Tovar's hearing problems, Tovar does not explain how these statements

relate to her September 2019 request for a different seat or how they represent "evidence of

discriminatory statements or attitudes on the part of the employer" indicating a pretext for her

eventual dismissal.  *Holcomb*, 433 F.3d at 897.

Tovar emphasizes another instance on March 6, 2020, when Ongena reportedly asked

why she required accommodations when another staff member—who also suffers from

ADHD—did not need them.  Pl.'s Opp'n at 15.  Tovar contends that Ongena similarly asked

why Tovar required a seating accommodation if she has a hearing difficulty.[7]  *Id.*  Ongena denies

---

[7] The Court notes that while Tovar includes these assertions in her statement of facts, she cites pages of an exhibit not in the record.  *See* Pl.'s Statement ¶ 23.  Because the paragraph did not comply with Local Rule 7(h), Callison did not see the need to rebut it.  *See* Def.'s Resp. at 72.  Tovar's briefing nonetheless indicates that the information may be found in Exhibit 11 to her summary judgment opposition.  *See* Pl.'s Opp'n at 15 (citing Ex. 11 at 1).  Exhibit 11 constitutes a June 4, 2020, email from Tovar to Gsell describing the conversation, which had occurred three months prior.  *See* Pl.'s Ex. 11 at 72.  The exhibit may constitute hearsay in its current form,

asking those questions, *see* Def.'s Ex. 4 at 20–22, indicating a factual dispute.  Callison argues

that "none of this is material to the issues on summary judgment."  Def.'s Resp. at 72.

Again, the ultimate question is whether this evidence is "sufficient . . . for a reasonable

jury to find that [Callison's] asserted non-discriminatory reason" for firing Tovar "was not the

actual reason and that [it] intentionally discriminated against" her based on the 2019 request for

accommodations.  *Brady*, 520 F.3d at 494.  It is undisputed that Callison was reducing its

staffing levels, and the company has produced significant evidence that Tovar's supervisors and

company leadership were unsatisfied with her performance at that time.  This evidence includes

emails between managers and Tovar in which she recognized performance difficulties, as well as

emails from leadership containing complaints about her performance.  On the day she was

discharged, Tovar herself believed she would be dismissed for missing a deadline.  *See* Def.'s

Ex. 42, ECF No. 77-44.  She was also not the only staff member discharged for falling below

performance standards.  *See* Def.'s Resp. at 50–51.

The submission of "rebuttal evidence alone will not always suffice to permit an inference

of discrimination."  *Aka*, 156 F.3d at 1292.  A similar set of circumstances can be found in

*Johnson v. Perez*, in which an employee sued his employer for race-based discrimination after

his termination for performance issues.  823 F.3d 701 (D.C. Cir. 2016).  The plaintiff there put

forward at least some evidence to challenge his employer's justifications for firing him,

including statements from colleagues contradicting the manager's rationales.  *Id.* at 707–09.  The

court nonetheless reasoned that "[a]ll of the record evidence memorializing" the manager's

"justifications for terminating" him was "consistent," and that the employee had failed to present

---

although the Court was able to locate some analogous discussion in Tovar's deposition
testimony.  *See* Def.'s Ex. 2 at 11.  Such a statement by a supervisor is likely to be considered
admissible as an opposing party's statement.  *See* Fed. R. Evid. 801(d)(2)(D).

"any evidence calling into question the factual basis for [the manager's] conclusion that [his] job performance was inadequate." *Id.* at 707.  As a result, the employer was "entitled to summary judgment." *Id.* at 709.

In the face of Callison's wide-ranging evidence documenting managers' dissatisfaction with Tovar's work, she, like the plaintiff in *Johnson*, musters insufficient evidence for a reasonable jury to determine that her managers did not fire her based on her performance. Ongena's alleged comments were—according to Tasho's own description—not "malicious" in nature.  Pl.'s Ex. 11 at 72.  The meeting also occurred four months before Callison decided to dismiss Tovar and would constitute the only intervening instance where a manager discussed the accommodations with her.  This greatly weakens any inference that the accommodation request represented a consistent theme in her relationship with management or the cause of her discharge.  And "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also Baloch*, 550 F.3d at 1200 (stating that a plaintiff-employee must "produce sufficient evidence" at summary judgment "that would discredit [the employer's proffered explanation] and show that the actions were retaliatory").[8]

No other evidence in the record precludes summary judgment here.  The temporal proximity between the September 2019 accommodation request and the July 2020 dismissal does

---

[8] Tovar additionally cites a conversation in 2014 in which a human resources staff member "warned" her that if she submitted a formal accommodation request, "it could affect the company's perception of her."  Pl.'s Opp'n at 12.  Tovar again cites portions of a deposition not in evidence.  *See* Pl.'s Statement ¶ 11 (citing Pl.'s Ex. 35).  Even if Tovar produced the underlying deposition testimony, the statement made nearly six years before Tovar was discharged would add little to the evidence tending to show that Callison did not dismiss her in 2020 for performance reasons during company-wide restructuring.

not alone support causation.  Temporal proximity does not necessarily represent the "positive evidence" required to rebut an employer's "proffered explanations." *Woodruff*, 482 F.3d at 530. Reliance on the length of time between the request and eventual dismissal would be insufficient to establish even a prima facie case, let alone demonstrate "that the employer's asserted . . . non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Allen*, 795 F.3d at 39 (quoting *Brady*, 520 F.3d at 494).  When establishing a prima facie case, courts in this circuit have "generally found that a two- or three-month gap between the protected activity and the adverse employment action does not establish the temporal proximity needed to prove causation." *Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013) (citing *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009); *Tressler v. Amtrak*, No. 09-cv-2027, 2012 WL 5990035, at *11 (D.D.C. Nov. 30, 2012)).  While there is no "bright-line" rule, *Jones*, 922 F. Supp. 2d at 42 (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012)), the ten months between Tovar's engagement in protected activity and her eventual dismissal would not allow a jury to infer discriminatory treatment based on the September 2019 request alone.

Any causal link is additionally attenuated by Callison's switch to work-from-home status. By the time Tasho and Ongena decided to dismiss Tovar, the company had been allowing employees to work from home for approximately four months in response to the pandemic, and it had mandated remote work for nearly as long. *See* Def.'s Resp. at 33–34.  Tovar thus no longer required a seating accommodation in the office and had not made use of that accommodation for a significant period before her termination.

Tovar additionally argues that Callison's "shifting explanations" for her termination nonetheless create a jury question about whether the company's actions were discriminatory.

Pl.'s Opp'n at 28–33.  It is correct that in employment discrimination cases, "shifting and inconsistent justifications are 'probative of pretext.'" *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (quoting *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)); *see also Evans v. Sebelius*, 716 F.3d 617, 620–21 (D.C. Cir. 2013) (determining that "shifting reasons" for non-promotion of employee supported denial of summary judgment).  Tovar asserts that Callison provided her differing explanations of her dismissal on the July 27, 2020, termination call; in the termination letter she received; in a subsequent email from Tasho; and in the company's communications with the D.C. Department of Employment Services ("DOES").  Pl.'s Opp'n at 28–33.

On July 27, 2020, Ongena explained that the company based its decision on the business "shifting and responding through COVID" as well as Tovar's "overall performance."  Def.'s Resp. at 56–57.  The letter Tovar received, also dated July 27, 2020, noted the need to "reduce staffing" and that Tovar's "position is to be consolidated or eliminated."  Pl.'s Ex. 21 at 132. The August 11, 2020, email from Gsell explained that "financial unrest" from the pandemic represented "the primary reason why" Callison made staffing changes, and then reprised the performance issues the firm perceived.  Pl.'s Ex. 17 at 113.  Gsell similarly indicated to DOES that Callison had dismissed Tovar due to COVID-19.  Pl.'s Ex. 22 at 138.

The Court concludes that no "reasonable jury could perceive such a conflict" based on the record here.  *Minter*, 809 F.3d at 71.  Callison's omission of one reason or another on various pieces of paperwork does not indicate that its explanations were "shifting" or otherwise "inconsistent."  *Geleta*, 645 F.3d at 413.  Callison's explanation does not resemble cases where an employer seeks "to collect post hoc justifications" for the dismissal.  *Small v. Off. of Congressman Henry Cuellar*, 485 F. Supp. 3d 275, 281 (D.D.C. 2020).  Nor has Callison's

explanation shifted during discovery.  *See Evans*, 716 F.3d at 621–22.  The statements also do

not show that Callison was "waffling between the two reasons" or later denied reliance on one of

them.  *Bhatia*, 310 F. Supp. 2d at 33.  These facts plainly do not evince an employer

"dissembling to cover up a discriminatory purpose."  *Reeves v. Sanderson Plumbing Prod., Inc.*,

530 U.S. 133, 134 (2000).

Tovar additionally raises a theory that Callison posted a job vacancy on July 16, 2020,

matching the description of her position.  *See* Pl.'s Opp'n at 21, 27–28.  Tovar asserts both that

Callison attempted to fill her position before the company fired her and that it continued to hire

staff.  This, Tovar argues, undermines Callison's justification that it was required to engage in a

reduction in force and indicates pretext.  Pl.'s Opp'n at 4–5.  The parties debate whether the

position was posted to fill Tovar's job or to "backfill" a position vacated by another employee on

July 10, 2020.  Def.'s Reply at 13; *see also* Def.'s Reply Ex. 47 at 63, ECF No. 80-2.  Tovar

contends that Callison posted the other staff member's position in October, although the

proffered evidence, some of which is not in the record, largely amounts to speculation about the

purpose of the job posting.  *See* Pl.'s Ex. 37 at 193; Pl.'s Statement ¶ 53 (citing deposition not in

the record); Def.'s Reply Ex. 45 at 39.

Tovar is correct that if Callison engaged in continued hiring within the marketing

department, or if it sought specifically to replace her, that this would undercut the company's

stated rationale that it dismissed her as part of a reduction in force.[9]  Yet this dispute would have

---

[9] The Court notes that while ongoing hiring may undermine the reduction-in-force
rationale, it would not undercut Callison's closely related explanation that it was broadly
restructuring to become more efficient as the company weathered economic headwinds.  Callison
has repeatedly stylized its decision as based on "several restructurings for business reasons,"
Def.'s Mot. at 12, "shifting and responding through COVID," Def.'s Resp. at 56–57, and the
assertion that Tovar's "position is to be consolidated or eliminated," Pl.'s Ex. 21 at 132.  It is
additionally undisputed that Callison engaged in company-wide layoffs throughout 2020.  *See*

no bearing on the company's other rationale for dismissing Tovar: performance issues.  Indeed, "the employee" bears the burden of "produc[ing] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason *and* that the employer intentionally discriminated against" her.  *Brady*, 520 F.3d at 494 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08 (1993)) (emphasis added).  As discussed above, Tovar produces little that would allow a jury to conclude that her managers dismissed her in July 2020 not because she failed to meet the company's standards, but because of her September 2019 accommodations request.[10]

In sum, although Tovar was dismissed while seeking disability accommodations, which constitutes a protected activity under the DCHRA, she does not produce sufficient evidence for a trial over whether Callison fired her for doing so.  Callison provides significant documentation showing that it dismissed Tovar based on managers' perceptions of her performance, and she does not offer sufficient evidence for a jury to conclude that this "asserted non-discriminatory reason was not the actual reason" or that Callison "intentionally discriminated against" her because she sought accommodations.  *Brady*, 520 F.3d at 494.  Tovar's "factual proffer requires too much speculation to create a genuine issue of fact about [her supervisors'] motivations."

---

Def.'s Resp. at 34; Def.'s Ex. 2 at 77.  Callison does not explain how it decided to continue hiring for roles within the marketing department during these layoffs, however.

[10] Tovar additionally takes issue with an email exchange in which Ongena sought feedback from Gsell—a human resources staff member—on an outline for the July 27 termination call.  *See* Pl.'s Opp'n at 26.  Plaintiff cites the wrong exhibit, but the Court has found the relevant correspondence elsewhere.  *See* Pl.'s Ex. 16 at 110.  In that email, Gsell suggested noting that "the team has worked to address" the issues covered by Tovar's 2020 accommodations request.  *Id.*  Tasho does not appear to have adopted that suggestion.  *See* Def.'s Resp. at 56–57.  Tovar does not explain how the email demonstrates that she was terminated because of an accommodations request, and the inference is not apparent to the Court.

*Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998).  As a result, Callison is entitled to summary judgment on the retaliation claim.[11]

## V.  CONCLUSION

For the foregoing reasons, Callison's motion for summary judgment is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 10, 2024                                                RUDOLPH CONTRERAS
                                                                              United States District Judge

---

[11] Tovar's complaint contains no claim that Callison discharged her because of her disabilities.  *See* ECF No. 1-1.  Callison appears to recognize this, but it nonetheless seeks "summary judgment on any disability discrimination claim."  Def.'s Mot. at 13.  To the extent that Tovar does claim discrimination based on her disabilities—and not solely for seeking accommodations—she would be unable to point to a genuine issue of material fact on this record for the same reasons discussed in this subsection.  Callison has stated non-discriminatory reasons for firing Tovar, and she cannot show that her supervisors fired her based on performance as a pretext for disability discrimination.